TRACY L. WILKISON
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, General Civil Section
MATTHEW J. SMOCK (Cal. Bar No. 293542)
Assistant United States Attorney
        Federal Building, Suite 7516
        300 North Los Angeles Street
        Los Angeles, California 90012
        Telephone: (213) 894-0397
        Facsimile: (213) 894-7819
        E-mail: Matthew.Smock@usdoj.gov

Attorneys for Defendants Martin J. Walsh
and United States Department of Labor

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| PERSIAN BROADCAST SERVICE GLOBAL INC., a California corporation,<br><br>            Plaintiff,<br><br>            v.<br><br>MARTIN J. WALSH, et al.,<br><br>            Defendants. | No. 2:21-cv-00229-CAS (GJSx)<br><br>**DEFENDANTS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 29); MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Separate Statement and [Proposed] Order and Judgment]<br><br>Hearing Date:    February 7, 2022<br>Hearing Time:    9:00 a.m.<br>Location:        U.S. Courthouse<br>                 350 W. 1st St.<br>                 Courtroom 8D<br>                 Los Angeles, CA 90012<br><br>Hon. Christina A. Snyder |

## **TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ...................................................................................... iii

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** ........... viii

**MEMORANDUM OF POINTS AND AUTHORITIES** ............................................ 1

**I.      INTRODUCTION** ........................................................................................ 1

**II.     BACKGROUND** ........................................................................................... 2

      A.     Statutory and Regulatory Background ............................................... 2

      B.     Factual Background ............................................................................. 4

      C.     Procedural History .............................................................................. 6

**III.    LEGAL STANDARDS** ................................................................................ 8

      A.     Persian's APA Claim .......................................................................... 8

      B.     Defendants' Enforcement Counterclaim ............................................ 9

**IV.    ARGUMENT** ............................................................................................... 9

      A.     The ARB's Decision Was Supported by Substantial Evidence and Was Reasonable and in Accordance with Law. ................................... 9

            1.     Persian Failed to Pay Varess the Required Wage Under Both LCAs. ...................................................................................... 9

            2.     The LCAs' Wage Obligations Were Valid and Enforceable. .......... 11

                 a.     The Regulations Do Not Contain Exceptions from the Wage Requirement for Visa Expiration or Travel Abroad. ................................................................... 11

                 b.     Varess's Visa Expiration and Travel Outside the United States Did Not End His "Period of Authorized Employment." ............................................ 12

                 c.     Varess's Travel Abroad Did Not Place Him in Voluntary Nonproductive Status or Render Him Unable to Work. ........ 14

                 d.     Persian Never Effected a Bona Fide Termination. ................. 15

                 e.     The ARB's conclusion is consistent with the policy of the E-3 statute and regulations. ........................... 16

            3.     Varess's Administrative Complaint Was Timely. ........................... 19

      B.     The Court Should Grant Summary Judgment to Defendants on Their Counterclaim for Enforcement of the ARB's Order. ................................. 20

1.    Defendants Are Entitled to a Judgment Enforcing the ARB's
      Order. ........................................................................................ 21

2.    The Court Should Award Prejudgment Interest at the Rate Set
      by the ARB, and Postjudgment Interest Pursuant to 28 U.S.C. §
      1961 ......................................................................................... 22

**V.    CONCLUSION** ................................................................................ **23**

# **TABLE OF AUTHORITIES**

## **Cases**

*Administrator v. ME Global, Inc.*,
No. 2016-0087, 2019 WL 3293915 (ARB Mar. 22, 2019) ............................14, 15, 19

*Administrator v. S V Techs., LLC*,
No. 12-042, 2013 WL 6979699 (ARB Dec. 23, 2013 ..................................................15

*Alaska Dep't of Health & Social Servs. v. Ctrs. for Medicare & Medicaid Servs.*,
424 F.3d 931 (9th Cir. 2005).....................................................................................9, 19

*Am. Bioscience, Inc. v. Thompson*,
269 F.3d 1077 (D.C. Cir. 2001) ......................................................................................8

*Batyrbekov v. Barclays Capital*,
No. 13-013, 2014 WL 3886828 (ARB July 16, 2014) ..................................................16

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*,
631 F.3d 1072 (9th Cir. 2011) .........................................................................................8

*Craft v. Nat'l Park Serv.*,
34 F.3d 918 (9th Cir. 1994)............................................................................................12

*Cyberworld Enter. Techs., Inc. v. Napolitano*,
602 F.3d 189 (3d Cir. 2010)...........................................................................................21

*Dedios v. Med. Dynamic Sys., Inc.*,
No. 16-072, 2018 WL 2927675 (ARB Mar. 30, 2018) .................................................11

*Family Inc. v. USCIS*,
469 F.3d 1313 (9th Cir. 2006) .........................................................................................8

*Gupta v. Jain Software Consulting, Inc.*,
No. 05-008, 2007 WL 1031365 (ARB Mar. 30, 2007) .................................................16

*Huang v. Admin. Rev. Bd.*,
No. 12-cv-0035, 2013 WL 4042008 (S.D. Tx. Aug. 8, 2013)......................................13

*Irwin Co., Inc. v. 3525 Sage St. Assocs., Ltd.*,

   37 F.3d 212 (5th Cir. 1994).................................................................21

*Jain v. Empower IT, Inc. d/b/a Infobahn Techs.*,

   No. 08-077, 2009 WL 3614509 (ARB Oct. 30, 2009) ................................19

*Judulang v. Holder*,

   565 U.S. 42 (2011).........................................................................8

*Kisor v. Wilkie*,

   139 S. Ct. 2400 (2019) ...................................................................9

*Kolbusz-Kijne v. Tech. Career Inst.*,

   No. 93-LCA-0004, 1994 WL 897284

   (DOL Ofc. of Admin. Appeals July 18, 1994) ........................................16

*Landis v. Wash. State Major League Baseball Stadium Pub. Facilities Dist.*,

   11 F.4th 1101 (9th Cir. 2021) ........................................................9, 19

*Lands Council v. Powell*,

   395 F.3d 1019 (9th Cir. 2005) ......................................................8, 13

*Mao v. Nasser Eng'g & Comput. Servs.*,

   No. 06-121, 2008 WL 5079135 (ARB Nov. 26, 2008) ...............................22

*Nance v. EPA*,

   645 F.2d 701 (9th Cir. 1981).............................................................8

*Occidental Eng'g Co. v. INS*,

   753 F.2d 766 (9th Cir. 1985).............................................................8

*S. Ill. Univ. School of Med. v. U.S. Dep't of Labor*,

   No. 1:18-cv-1092, 2021 WL 5609845 (C.D. Ill. Nov. 30, 2021)...................22

*Spinner Corp. v. Princeville Dev. Corp.*,

   849 F.2d 388 (9th Cir. 1988)...........................................................12

*Syed v. M-I, LLC*,

   853 F.3d 492 (9th Cir. 2017)...........................................................12

*Szajer v. City of Los Angeles*,
   632 F.3d 607 (9th Cir. 2011) ........................................................................... 9

*Tkacz v. Bogden*,
   No. 18-15771, 788 F. App'x 528 (9th Cir. Dec. 19, 2019) ............................. 8

*United States v. City of Redwood City*,
   640 F.2d 963 (9th Cir. 1981) ......................................................................... 21

*United States v. Occidental Chem. Corp.*,
   200 F.3d 143 (3d Cir. 1999) ........................................................................... 21

*United States v. Santee Sioux Tribe of Neb.*,
   135 F.3d 558 (8th Cir. 1998) ......................................................................... 21

*United States v. Town of Bolton Landing*,
   946 F. Supp. 162 (N.D.N.Y. 1996) .............................................................. 21

*W. Pac. Fisheries, Inc. v. SS President Grant*,
   730 F.2d 1280 (9th Cir. 1984) ...................................................................... 22

**Statutes**

5 U.S.C. § 706(2)(A), (E) .................................................................................. 8

8 U.S.C. § 1101(a)(15)(E)(iii) .......................................................................... 2

8 U.S.C. § 1182 .................................................................................................. 2

8 U.S.C. § 1182(n) ............................................................................................. 3

8 U.S.C. § 1182(t) .............................................................................................. 2

8 U.S.C. § 1182(t)(1)(A) .................................................................................. 11

8 U.S.C. § 1182(t)(1)(A)(i) ...................................................................... 3, 10, 13

8 U.S.C. § 1182(t)(3) .......................................................................................... 3

8 U.S.C. § 1182(t)(3)(C)(vii)(I)-(II) ................................................................. 3

8 U.S.C. § 1182(t)(3)(C)(vii)(I)-(III) ............................................................. 11

8 U.S.C. § 1182(t)(3)(C)(vii)(IV) ............................................................... 3, 14

8 U.S.C. § 1182(t)(3)(D) ............................................................................. 21, 22

26 U.S.C. § 6621(a)(2)..................................................................................22

28 U.S.C. § 516...........................................................................................21

28 U.S.C. § 1961(a)................................................................................22, 23

**Rules**

Fed. R. Civ. P. 56(a)....................................................................................9

Local Civil Rule 56-1...................................................................................4

**Regulations**

20 C.F.R. § 655.700......................................................................................2

20 C.F.R. § 655.700(b)(2)............................................................................3

20 C.F.R. § 655.700(d)(1)............................................................................3

20 C.F.R. § 655.700(d)(2)............................................................................3

20 C.F.R. § 655.705(b)............................................................................2, 3

20 C.F.R. § 655.731(a)...............................................................................10

20 C.F.R. § 655.731(a)(1)...........................................................................10

20 C.F.R. § 655.731(a)(2)(viii)....................................................................11

20 C.F.R. § 655.731(c)(6)......................................................................11, 17

20 C.F.R. § 655.731(c)(6)(i).......................................................................18

20 C.F.R. § 655.731(c)(6)(ii)......................................................................18

20 C.F.R. § 655.731(c)(7)(i).....................................................................3, 11

20 C.F.R. § 655.731(c)(7)(ii)...............................................................passim

20 C.F.R. § 655.750(a)...........................................................................2, 12

20 C.F.R. § 655.750(b)(3)...........................................................................11

20 C.F.R. § 655.750(c)(3)...........................................................................11

20 C.F.R. § 655.800(a).................................................................................3

20 C.F.R. § 655.806(a).................................................................................3

20 C.F.R. § 655.806(a)(3).............................................................................3

20 C.F.R. § 655.806(a)(5) ..................................................................... 19

20 C.F.R. § 655.806(b) ............................................................................ 3

20 C.F.R. § 655.810(a) ............................................................................ 3

20 C.F.R. § 655.815 ................................................................................. 3

20 C.F.R. § 655.820 ................................................................................. 4

20 C.F.R. § 655.845 ................................................................................. 4

20 C.F.R. part 655 subpart I .................................................................... 3

22 C.F.R. § 41.112(a) ............................................................................. 12

22 C.F.R. § 41.51(c) ................................................................................ 2

70 Fed. Reg. 52,292 (Sept. 2, 2005) ....................................................... 3

72 Fed. Reg. 1650 (Jan. 12, 2007) ...................................................... 2, 3

85 Fed. Reg. 13,186 (Mar. 6, 2020) ........................................................ 4

**Other Authorities**

State Department Foreign Affairs Manual ("FAM"), 9 FAM 402.9-8(L)(a) .................... 2

# <u>NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT</u>

PLEASE TAKE NOTICE that, on February 7, 2022 at 9:00am, or as soon thereafter as they may be heard, Defendants Martin J. Walsh and the United States Department of Labor ("Defendants") will, and hereby do, move this Court for summary judgment on Plaintiff Persian Broadcast Global Service, Inc.'s ("Persian") Administrative Procedure Act ("APA") claims, as well as on Defendants' counterclaim for enforcement of the Department of Labor's final order under the Immigration and Nationality Act ("INA").  Defendants concurrently submit this brief in opposition to Plaintiffs' Motion for Summary Judgment (ECF No. 29).  This motion will be made in the First Street Federal Courthouse before the Honorable Christina A. Snyder, United States District Judge, located at 350 W. 1st Street, Los Angeles, CA 90012.

Defendants bring the motion on Persian's APA claim on the grounds that the ARB's award of $183,794 in back wages, plus interest, to Majid Varess was based on substantial evidence, was not arbitrary, capricious, or an abuse of discretion, and was in accordance with law.  Defendants bring the motion on their counterclaim pursuant to their authority to enforce the INA and on the grounds that the DOL order is final and Persian has failed to comply.

This motion is made upon this Notice, the attached Memorandum of Points and Authorities, the Certified Administrative Record (ECF No. 22) and all pleadings, records, and other documents on file with the Court in this action, and upon such oral argument as may be presented at the hearing of this motion.

This motion is made following the conference of counsel pursuant to Local Rule 7-3, which was held on November 19, 2021.

Dated: December 13, 2021

Respectfully submitted,

TRACY L. WILKISON
Acting United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, General Civil Section

_/s/ Matthew J. Smock_
MATTHEW J. SMOCK
Assistant United States Attorney

Attorneys for Defendants

Of counsel:
Jennifer S. Brand, Associate Solicitor
Jonathan Kronheim, Counsel for Trial
Litigation
Jesse Z. Grauman,  Senior Attorney
U.S. Department of Labor
Office of the Solicitor
Fair Labor Standards Division
200 Constitution Avenue NW
Room N-2716
Washington, D.C. 20210

Attorneys for Defendants

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

This case involves an employer's blatant failure to pay a nonimmigrant worker his required compensation, and its subsequent attempts to evade responsibility.  Beginning in 2011, Persian Broadcast Service Global ("Persian"), a Farsi-language television station, employed Majid Varess, an Australian national, as a sports producer and reporter pursuant to an E-3 visa and an accompanying Labor Condition Application ("LCA").  The LCA, and the relevant statutory and regulatory provisions, required Persian to pay Varess the greater of the prevailing or actual wage, which Persian attested was $45,000 per year.  Two years later, Persian filed a second LCA, seeking to extend Varess's employment until late 2015 at a required wage of $60,000.

Persian completely failed to meet its wage obligations, paying Varess only about $20,000 during his entire employment.  Still, Varess continued to work for Persian, both out of personal obligation and because he had invested so much in this opportunity.  He looked forward to broadcasting the 2014 World Cup, and left the United States for Australia in late 2013 intending to renew his visa.  Eventually, however, due largely to Persian's failure to pay him, he decided to stay in Australia, though he continued to work for Persian under the terms of his second LCA.  Finally, in July 2014, after Persian told him that it could no longer pay him, Varess stopped working for Persian altogether.

In administrative proceedings before the Department of Labor ("DOL"), Varess was awarded $183,794, plus interest, for Persian's egregious violations.  Persian now challenges DOL's order under the Administrative Procedure Act.  Persian does not contend that it paid Varess in accordance with its LCAs.  Instead, while it does not dispute the first LCA's validity, it argues that Varess has no remedy for its violations of that LCA because his administrative complaint to DOL was time-barred.  It further argues that it was not required to pay Varess under the second LCA because his visa expired and he left the country, even though Varess had repeatedly shown that he could work while abroad, and even though his job as a reporter included overseas travel.

1

Persian's arguments should be rejected.  Both of its LCAs were valid, binding, and enforceable.  Its argument that Varess's visa non-renewal or departure from the United States relieved it of its wage obligations lacks support in the INA or its regulations.  As a result, Persian's contention that Varess's administrative complaint was time-barred fails as well, since Persian's wage violations continued even as Varess filed his complaint in February 2015.  The Court should accordingly grant summary judgment to Defendants on Persian's APA complaint, deny Persian's motion for summary judgment, grant summary judgment to Defendants on their counterclaim for enforcement of DOL's order, and enter a judgment directing Persian to pay the back wages and interest that Varess has been owed for the better part of a decade.

## II.   BACKGROUND

### A.   Statutory and Regulatory Background

The E-3 visa program of the Immigration and Nationality Act ("INA") allows Australian nationals to work in the United States temporarily in "specialty occupation[s]."  8 U.S.C. § 1101(a)(15)(E)(iii).  To employ an E-3 worker, the employer must file a Labor Condition Application ("LCA") with the Department of Labor ("DOL") stating its intention to employ a nonimmigrant in a particular occupation.  8 U.S.C. § 1182(t); 20 C.F.R. § 655.700.[1]  After DOL certifies an LCA, the worker applies to the Department of State for a visa, which, if granted, allows the worker to enter the United States for a two-year period.  20 C.F.R. §§ 655.705(b), 655.750(a); 22 C.F.R. § 41.51(c); State Department Foreign Affairs Manual ("FAM"), 9 FAM 402.9-8(L)(a);[2] 72 Fed. Reg. 1650, 1651 (Jan. 12, 2007).  The requirements and enforcement mechanisms for the E-3 program are largely, though not entirely, identical to those for the H-1B visa program, which applies to temporary foreign workers in specialty

---

[1] 8 U.S.C. § 1182 contains two paragraph (t)'s.  The provisions regarding E-3 employment are in the first § 1182(t).

[2] https://fam.state.gov/FAM/09FAM/09FAM040209.html#M402_9_8_L.

occupations generally.  *See* 20 C.F.R. § 655.700(d)(2); *see generally* 8 U.S.C. § 1182(n).[3]

The LCA contains certain binding attestations, one of which is that during the "period of authorized employment," the employer must pay a required wage, which is the higher of (1) "the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question," or (2) "the prevailing wage level for the occupational classification in the area of employment." 8 U.S.C. § 1182(t)(1)(A)(i).  E-3 employees generally must be paid the required wage even when in nonproductive status.  8 U.S.C. § 1182(t)(3)(C)(vii)(I)-(II); 20 C.F.R. § 655.731(c)(7)(i).  But the employer need not pay the required wage if a period of nonproductive status is due to non-work-related factors that take the nonimmigrant away from work for the worker's convenience (e.g., vacation) or render the nonimmigrant unable to work (e.g., maternity leave).  8 U.S.C. § 1182(t)(3)(C)(vii)(IV); 20 C.F.R. § 655.731(c)(7)(ii).  The employer also need not pay the required wage if there has been a *bona fide* termination of the employment relationship.  20 C.F.R. § 655.731(c)(7)(ii).

Pursuant to Congressional authority, DOL enforces these requirements.  8 U.S.C. § 1182(t)(3); 20 C.F.R. part 655 subpart I.  An aggrieved party must file a complaint with DOL's Wage and Hour Division ("WHD").  20 C.F.R. §§ 655.800(a)*;* 655.806(a).  After WHD investigates the complaint, it issues a letter with its determination and any remedies, including the payment of any back wages due.  *Id.* §§ 655.806(a)(3), (b); 655.810(a), 655.815.  WHD's determinations can be challenged in a hearing before an

---

[3] As a result, references in DOL's regulations to H-1B workers generally encompass E-3 workers, with certain exceptions.  20 C.F.R. § 655.700(d)(2).  One distinction between the H-1B and E-3 programs is that to employ an H-1B worker, the employer must take the additional step of filing a petition with the Department of Homeland Security's ("DHS") United States Citizenship and Immigration Services ("USCIS").  20 C.F.R. § 655.700(b)(2).  This requirement is inapplicable to E-3 workers. *Id.* § 655.700(d)(1); 70 Fed. Reg. 52,292, 52,292 (Sept. 2, 2005); 72 Fed. Reg. at 1651.  Contrary to suggestions in Persian's brief, ECF No. 29 at 14, 18, USCIS plays no role in issuing an initial E-3 visa or authorizing E-3 employment.  *See* 20 C.F.R. 655.705(b).

administrative law judge ("ALJ"), *id.* § 655.820, and the ALJ's decision may be appealed to DOL's Administrative Review Board ("ARB"), *id.* § 655.845.  While the Secretary of Labor has discretion to review ARB decisions, the ARB's orders become final DOL orders if the Secretary does not exercise this authority within prescribed time limits.  *See* Secretary's Order 01-2020, 85 Fed. Reg. 13,186 (Mar. 6, 2020).

### B.    Factual Background

Persian Broadcast Global, Inc. ("Persian"), a California corporation, operates Pars TV, a Farsi-language television station that serves the Persian community.  Defendants' Statement of Uncontroverted Facts ("DSF") 1.[4]  Its president and chief operating officer is Amir Shadjareh.  DSF 2.  Majid Varess is an Australian national of Iranian origin who has worked since 1974 as a sports producer and reporter.  DSF 3.

In 2011, at the age of 61, Varess came to the United States to work for Persian on an E-3 visa.  DSF 4.  Varess relocated at a significant financial and personal cost, including airfare, rent payments in Australia and the United States, furniture, appliances, and other expenses in the United States, and time away from his family in Australia. DSF 5-6.  Despite these drawbacks and his own health problems, he viewed the position as a unique late-career opportunity to broadcast sports worldwide in Farsi for a station that shared his opposition to the Iranian regime.  DSF 7.

To employ Varess, Persian filed an LCA with DOL in September 2011.  DSF 8. The LCA indicated that Persian would be employing a "TV producer and reporter," that the prevailing wage rate for this position was $44,013 per year, and that Varess would be paid $45,000 per year.  DSF 9.  DOL approved the LCA for a period from September 12, 2011 to September 12, 2013.  DSF 10.  Varess obtained a visa with an expiration date of

---

[4] Defendants' Statement of Uncontroverted Facts, filed contemporaneously with this brief pursuant to Local Rule 56-1, contains citations to the numbered pages from the Certified Administrative Record ("CAR"), ECF No. 22.  Where necessary, this brief also cites to the CAR itself.

September 12, 2013, entered the United States on November 23, 2011, and began working for Persian.  DSF 11.

During Varess's employment with Persian, he hosted and produced sports programs.  DSF 12.  Varess estimated that he worked between 60 and 70 hours per week.  DSF 13.  Varess worked both in the United States and from other locations around the world, and thus left the United States and returned several times.  DSF 14.  For example, he reported from England during the Wimbledon tennis tournament, reported on soccer matches from England and Ireland, and also reported from Belgium, France, and Australia.  DSF 15.  He hoped to broadcast the 2014 World Cup soccer tournament, in which Iran participated, from Brazil.  DSF 16.  Varess could perform his duties overseas because he uploaded his shows using the internet and Persian broadcasted them via satellite.  DSF 17.  Shadjareh supported these efforts to broadcast overseas.  DSF 18.

In August 2013, Persian filed a second LCA to continue Varess's employment.  DSF 19.  That LCA listed the prevailing wage rate as $59,384 and stated that Varess would be paid an annual salary of $60,000.  DSF 20.  On August 30, 2013, DOL approved that LCA for a period from September 12, 2013 to September 12, 2015.  DSF 21.  Although Varess did not renew his visa upon its expiration in September 2013, when he entered the United States on September 3, 2013 after temporarily departing in July 2013, DHS's Customs and Border Protection ("CBP") admitted him for an additional two years until September 2, 2015, telling him he could remain and work in the United States.  DSF 22.

Varess continued working for Persian in the United States until November 16, 2013, when he traveled to Australia.  DSF 23, 24.  Prior to Varess's departure, Shadjareh signed a letter to the United States Consulate in Sydney, Australia in support of Varess's E-3 visa renewal application, stating that Persian desired to continue employing him at a salary of $60,000 per year.  DSF 25.  While Varess initially intended to renew his visa, he ultimately did not, largely due to Persian's failure to pay him.  DSF 26, 27.  However, he continued to work for Persian from overseas until July 14, 2014.  DSF 28.

Throughout Varess's employment, Persian completely failed to adhere to the wage attestations in its LCAs. It did not pay Varess a regular salary of either $45,000 or $60,000 per year as required. It paid Varess irregularly and sporadically in amounts between $300 and $2,300, for a total of only approximately $20,000 during his entire employment. DSF 29. Varess repeatedly brought up payment issues with Shadjareh and Persian, who would respond that the station was having financial difficulties and promise to pay him at a later date. DSF 30. Despite these repeated failures, Varess continued to work for Persian. As noted above, Varess had invested considerably in the position, and he also felt compelled to continue working to preserve his professional reputation and to work for a company opposed to the Iranian regime. DSF 5, 6, 7, 31. He hoped that Shadjareh would ultimately fulfill his obligations. CAR 438 (ECF No. 22-5 at 43).

On July 11, 2014, in response to another inquiry from Varess about his wages, Shadjareh told Varess, via text message, that he could no longer afford to pay him. DSF 32. Varess, deeply hurt and frustrated, did not perform any more work for Persian after July 14, 2014. DSF 33; CAR 370-72 (ECF No. 22-4 at 75-77). The record includes no evidence that Shadjareh ever informed Varess that his employment was terminated, and Varess did not understand Shadjareh's message as a notice of termination. DSF 34.

## C.  Procedural History

On February 5, 2015, Varess, through counsel, filed a written complaint with WHD, alleging that Persian failed to pay him the required wage. DSF 35. That complaint referred to an earlier telephonic complaint made on December 9, 2014. DSF 36. WHD investigated the complaint and issued a March 28, 2016 determination finding no violations. DSF 37. Varess requested an ALJ hearing to contest WHD's finding. DSF 38. The ALJ denied relief to Varess on December 14, 2017, finding that notwithstanding the LCAs, Varess was not an employee of Persian entitled to a salary. DSF 39.

Varess appealed to the ARB, which reversed and remanded on September 26, 2019, concluding that Persian was required to pay the wages specified in the LCAs.

6

DSF 40, 41.  The ARB found that (1) Varess "entered into employment" with Persian, (2) Persian never effected a *bona fide* termination, (3) Varess never entered into voluntary nonproductive status, and (4) any misrepresentations Varess may have made did not relieve Persian of its obligations.  CAR 812-14 (ECF No. 22-9 at 17-19).  Additionally, noting that Varess's duties included reporting from various locations and that he frequently produced programs outside the United States, the ARB concluded that "the mere fact that [Varess] was outside of the United States [did] not by itself indicate that he was not performing work for [Persian]."  CAR 813 (ECF No. 22-9 at 18).  It remanded to the ALJ for determinations on the timeliness of Varess's complaint and on any damages owed.  CAR 816-17 (ECF No. 22-9 at 21-22).

On remand, the ALJ concluded on October 30, 2019 that Varess's complaint was timely filed and that Persian owed Varess $183,794 in back wages plus pre- and post-judgment interest.  DSF 42.  The ALJ concluded that neither Varess's failure to renew his visa nor his departure from the United States vitiated Persian's responsibilities under the LCAs, that Persian's violations therefore continued until the end of the second LCA period in September 2015, and that Varess's February 2015 complaint was timely filed.  CAR 823-24 (ECF No. 22-9 at 28-29).  The ALJ found that Varess was entitled to $84,375 under the first LCA, and $120,000 under the second LCA, for a total of $204,375.  CAR 824 (ECF No. 22-9 at 29).  The ALJ further found that Persian paid Varess a total of $20,581, and therefore that Varus was owed $183,794 ($204,375 minus $20,581), plus interest.  *Id.*  Persian appealed to the ARB on November 26, 2019.  DSF 43.  On July 14, 2020, the ARB affirmed the ALJ.  DSF 44.  The Secretary did not exercise his authority to perform discretionary review.  Persian has not paid the amount it owes Varess under DOL's final order.  DSF 45.

On February 11, 2021, Persian filed a complaint against the Secretary of Labor and DOL ("Defendants"), challenging the ARB's order under the Administrative Procedure Act ("APA").  ECF No. 1.  On May 13, 2021, Defendants filed an answer and a counterclaim for enforcement of DOL's order.  ECF No. 11.  On June 2, 2021, Persian

1    filed its answer to the counterclaim.  ECF No. 12.  On September 7, 2021, Defendants

2    filed the Certified Administrative Record.  ECF No. 22.  On November 22, 2021, Persian

3    moved for summary judgment.  ECF No. 29.

4    **III.   LEGAL STANDARDS**

5         **A.     Persian's APA Claim**

6              Courts routinely resolve APA actions by summary judgment, *Occidental Eng'g*

7    *Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985), in which "the district judge sits as an

8    appellate tribunal," *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir.

9    2001).  Absent limited exceptions, review is limited to the agency's administrative

10   record.  *Lands Council v. Powell*, 395 F.3d 1019, 1029 (9th Cir. 2005).

11            Under the APA, a court may set aside agency action only if it is "arbitrary,

12   capricious, an abuse of discretion, or otherwise not in accordance with law," or

13   "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E).  This is a deferential

14   standard, and a court is not to reweigh the evidence or substitute its judgment for the

15   agency's.  *Judulang v. Holder*, 565 U.S. 42, 52-53 (2011); *Tkacz v. Bogden*, No. 18-

16   15771, 788 F. App'x 528, 529 (9th Cir. Dec. 19, 2019).  Review under the arbitrary-and-

17   capricious standard is limited to "whether there has been a clear error of judgment by the

18   agency and whether the agency action was based on a consideration of the relevant

19   factors." *Nance v. EPA*, 645 F.2d 701, 705 (9th Cir. 1981).  The Court may not "disturb

20   the agency's [factual] findings . . . unless the evidence presented would *compel* a

21   reasonable finder of fact to reach a contrary result." *Family Inc. v. USCIS*, 469 F.3d

22   1313, 1315 (9th Cir. 2006) (emphasis in original) (internal citation omitted).  Thus, if

23   DOL "considered the relevant factors and articulated a rational connection between the

24   facts found and the choices made," the Court must deny Persian's summary judgment

25   motion and grant Defendants' motion.  *Cal. Wilderness Coal. v. U.S. Dep't of Energy*,

26   631 F.3d 1072, 1084 (9th Cir. 2011).

27            In reviewing formal adjudications such as the one here, a court must defer to an

28   agency's interpretation of a statute when the statute is silent or ambiguous about an

issue, provided that the interpretation is based on a permissible construction of the statute. *See Alaska Dep't of Health & Social Servs. v. Ctrs. for Medicare & Medicaid Servs.*, 424 F.3d 931, 939 (9th Cir. 2005). A court also must defer to an agency's reasonable interpretation of any "genuinely ambiguous" regulatory provisions. *Landis v. Wash. State Major League Baseball Stadium Pub. Facilities Dist.*, 11 F.4th 1101, 1105 (9th Cir. 2021) (citing *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414-15 (2019)).

### B.   Defendants' Enforcement Counterclaim

Defendants move for summary judgment on their counterclaim to enforce the ARB's order. Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a), with the evidence viewed in the light most favorable to the nonmoving party. *Szajer v. City of Los Angeles*, 632 F.3d 607, 610 (9th Cir. 2011).

## IV.   ARGUMENT

### A.   The ARB's Decision Was Supported by Substantial Evidence and Was Reasonable and in Accordance with Law.

Persian does not dispute that it failed to pay Varess the required wage set forth in either LCA. Nor does it dispute that the first LCA was valid, that Varess worked for Persian under the first LCA, that DOL approved the second LCA, or that Varess began the second LCA period working for Persian in the United States. Rather, Persian contends that it is not liable for any back wages because Varess failed to renew his visa in September 2013 and then left the United States in November 2013. Persian argues that these actions absolved it of any wage obligations going forward and rendered his complaint untimely. Each of these arguments is misplaced.

#### 1.   Persian Failed to Pay Varess the Required Wage Under Both LCAs.

Persian was required by the INA and its regulations, and its own binding attestations in the LCAs, to pay Varess the greater of the prevailing wage level for the occupational classification in the area of employment or the actual wage level it paid to all other individuals with similar experience and qualifications for the specific

employment in question.  8 U.S.C. § 1182(t)(1)(A)(i); 20 C.F.R. § 655.731(a).  Under

the regulations, where there are other employees with substantially similar experience

and qualifications in the specific employment in question, the actual wage is the amount

paid those employees, but if no such other employees exist at the place of employment,

the actual wage is the amount that is paid to the nonimmigrant worker.  20 C.F.R.

§ 655.731(a)(1).  Varess's actual wage fell into the latter category, as his qualifications

and duties at Persian were unique.  *See* CAR 358 (ECF No. 22-4 at 63) (describing

Varess as "uniquely qualified" for his position); CAR 424 (ECF No. 22-5 at 29) (noting

that Persian never had a sports program before Varess worked there); CAR 543 (ECF

No. 22-6 at 48) (same).  Thus, because the first LCA listed a prevailing wage of $44,013

per year and an annual salary of $45,000, DSF 9, the actual wage, and the required wage,

was $45,000.  Likewise, because the second LCA listed a prevailing wage of $59,384

and a salary of $60,000, DSF 20, the required wage under the second LCA was $60,000.

Substantial record evidence supports the ALJ and ARB's findings that Persian

failed to pay these promised salaries.  Varess provided uncontroverted testimony that he

was never paid regularly.  CAR 393-96 (ECF No. 22-4 at 98-100, ECF No. 22-5 at 1),

415-16 (ECF No. 22-5 at 21).  The evidence Persian submitted—a combination of check

copies, tax forms, and an internal report—purported to show payments totaling only

$21,473.  CAR 319-37 (ECF No. 22-4 at 24-42); CAR 824 (ECF No. 22-9 at 29).

Although only $16,300 of this total was supported by copies of negotiated checks, the

ALJ accepted an admission by Varess's attorney that Varess was paid $20,581.  CAR

824 (ECF No. 22-9 at 29).  Neither Persian's complaint nor its summary judgment brief

contends that it paid Varess more than this.  Thus, assuming the LCAs were valid and

enforceable, the record establishes that Persian violated its wage obligations.

2.     The LCAs' Wage Obligations Were Valid and Enforceable.

    a.     *The Regulations Do Not Contain Exceptions from the Wage Requirement for Visa Expiration or Travel Abroad.*

An E-3 worker must receive the required wage "beginning on the date when the nonimmigrant 'enters into employment' with the employer." 20 C.F.R. § 655.731(c)(6); *see* 8 U.S.C. §§ 1182(t)(1)(A), 1182(t)(3)(C)(vii)(I)-(III). From that point on, the LCA binds the employer to pay the require wages for the duration of the employment relationship unless certain narrowly-defined exceptions are met. *See* 20 C.F.R. § 655.731(a)(2)(viii) ("The LCA is valid for the period certified by [DOL], and the employer must satisfy all the LCA's requirements (including the required wage which encompasses both prevailing and actual wage rates) for as long as any [E-3] nonimmigrants are employed pursuant to that LCA[.]"). Indeed, the employer must pay with the required wage even if the LCA is withdrawn, suspended, or invalidated, as long as the employer continues to employ the worker. *Id.* § 655.750(b)(3), (c)(3).

The regulations list only two circumstances in which employers need not pay the required wage. One is if there is a *bona fide* termination of the employment relationship. 20 C.F.R. § 655.731(c)(7)(ii). This permits the employer to "stop paying the employee altogether." *Dedios v. Med. Dynamic Sys., Inc.*, No. 16-072, 2018 WL 2927675, at *1 (ARB Mar. 30, 2018). The other is if the employee is in nonproductive status due to "conditions unrelated to employment which take the nonimmigrant away from his/her duties at his/her voluntary request and convenience (e.g., touring the U.S., caring for ill relative) or render the nonimmigrant unable to work (e.g., maternity leave, automobile accident which temporarily incapacitates the nonimmigrant)." 20 C.F.R. § 655.731(c)(7)(ii). If an employee is in nonproductive status for "any other reason," the employer must pay the required wage. 20 C.F.R. § 655.731(c)(7)(i).

Persian urges this court to carve out additional, unwritten exceptions for the expiration of an existing E-3 worker's visa and/or for travel outside the United States. The ARB, however, correctly rejected such exceptions as being unauthorized by the

11

regulations.  *See Syed v. M-I, LLC*, 853 F.3d 492, 501 (9th Cir. 2017) (when a provision contains express exceptions, "the familiar judicial maxim *expressio unius est exclusio alterius* counsels against finding additional, implied, exceptions"); *Craft v. Nat'l Park Serv.*, 34 F.3d 918, 922 (9th Cir. 1994) (explicit regulatory exceptions to a prohibition on altering a seabed suggested that all alterations other than those listed were prohibited); *Spinner Corp. v. Princeville Dev. Corp.*, 849 F.2d 388, 390 (9th Cir. 1988) ("It is an elementary principle of statutory construction that when a statute contains specific exceptions from coverage, it cannot be read to include other exceptions.").

          *b.*     *Varess's Visa Expiration and Travel Outside the United States Did Not End His "Period of Authorized Employment."*

Perhaps recognizing that the regulation does not contain the exceptions it seeks, Persian also suggests that Varess's "period of authorized employment" during which the wage requirement applied did not include any time after the expiration of his visa and/or departure from the United States.  ECF No. 29 at 18, 20-21.  Such an argument fails for two reasons.  First, DOL's regulations explicitly state that the "period of authorized employment" refers to the dates on the *LCA* approved by DOL, and thus do not require authorization from another agency as a condition precedent for LCA obligations to arise.  *See* 20 C.F.R. § 655.750(a) (explaining that "[t]he period of authorized employment . . . is based on the first date of employment and ends . . . [i]n the case of an E-3 . . . LCA, on the latest date indicated or two years after the employment start date under the LCA, whichever comes first").  Second, even if "authorized employment" contemplates authorization from another agency in addition to DOL, it is more reasonably understood as referring to the permission CBP grants a nonimmigrant to stay in the United States.  A visa governs only when an alien may enter the United States, and "[t]he period of visa validity has no relation to the period of time the immigration authorities at a port of entry [i.e., CBP] may *authorize* the alien to stay in the United States."  22 C.F.R. § 41.112(a) (emphasis added).  As noted above, when Varess returned to the United States on September 3, 2013, CBP admitted him until September 2015.  DSF 22.  He therefore

remained in a "period of authorized employment" for purposes of Persian's wage requirements even after his visa expired nine days later.[5]

These conclusions are further supported by the statutory text. While Persian contends that its obligations to Varess ceased because Varess no longer had "legal status" after his visa expired, the wage obligation applies to any workers "admitted *or* provided status under" the E-3 visa program. 8 U.S.C. § 1182(t)(1)(A)(i) (emphasis added). Like the above authorities, this makes clear that Persian's obligation to pay Varess the required wage did not simply end once Varess's visa expired, given that he was indisputably "admitted" in September 2013 for an additional two years.[6]

---

[5] Persian argues that Varess's admission by CBP in September 2013 for an additional 2 years was "incorrect" and a "procedural error," but cites no authority other than a "practice tip" by the American Immigration Lawyers Association ("AILA"). ECF No. 29 at 18-19. The Court should disregard this document as it is outside the administrative record. *Lands Council*, 395 F.3d at 1029. But even considering the quoted excerpt, it in no way proves that Varess's admission was in error. To the contrary, it states that "CBP . . . may not view [admission for periods exceeding an E-3 visa or LCA validity period] as 'errors.'" ECF No. 29 at 19. At most, then, the AILA document shows that there may be ambiguity regarding an E-3 worker's status under such a scenario. This Court should defer to the ARB's resolution of any such ambiguity in its conclusion that the LCA remained binding even after Varess's visa expired, particularly given Varess's testimony that he understood CBP's admission as obviating any need to renew his visa. CAR 439-40, 445-46 (ECF No. 22-5 at 44-45, 50-51).

[6] *Huang v. Admin. Rev. Bd.,* No. 12-cv-0035, 2013 WL 4042008 (S.D. Tex. Aug. 8, 2013), on which Persian relies, ECF No. 29 at 25-26, is distinguishable. In *Huang*, the court affirmed the ARB's award of back pay to a wrongfully terminated H-1B worker until the date his visa expired, including the ARB's denial of any "front pay" after that date. 2013 WL 4042008, at *7. The court concluded that in addition to the lack of statutory authority for a front pay award, there was "no basis to find that [the worker] could have continued working at [his former employer]" after his visa expired. *Id.* Unlike this case, there was no indication in *Huang* that the worker possessed a valid, binding LCA that extended well past his visa expiration date. Moreover, unlike the worker in *Huang*, Varess *actually did* work for his employer after his visa expired— inside the United States until November 16, 2013 and outside the United States afterwards, as he had done several times previously.

13

1

2

                  *c.*     *Varess's Travel Abroad Did Not Place Him in Voluntary*
                           *Nonproductive Status or Render Him Unable to Work.*

3

4

5

6

7

8

An employer need not pay an E-3 worker the required wage during a period of nonproductive status that is due to non-work-related factors that take the nonimmigrant away from work for the worker's convenience or that render the nonimmigrant unable to work. 8 U.S.C. § 1182(t)(3)(C)(vii)(IV); 20 C.F.R. § 655.731(c)(7)(ii). The fact that Varess spent portions of his LCA periods outside the United States, however, did not relieve Persian of its wage obligations.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

To be sure, for many nonimmigrant workers, a departure from the United States would meet either or both of these criteria. *See, e.g.*, *Administrator v. ME Global, Inc.*, No. 2016-0087, 2019 WL 3293915, at *7 (ARB Mar. 22, 2019) (employer was not required to pay metallurgical engineer for time during which he was unavailable to work after he returned to Canada). But that was simply not the case with Varess. Because his duties included off-site work, his travel did not render him nonproductive or "unable to work." Shadjareh's letter in support of Varess's visa renewal explicitly described Varess's duties as including "[r]eport[ing] live from relevant sporting arenas and other external locations." CAR 357 (ECF No. 22-4 at 62). As explained above and as the ARB found, Varess worked for Persian during periods he was outside the United States, including reporting from Ireland, Belgium, France, and Australia; Shadjareh supported these activities, and Varess's ability to work abroad was not compromised since he could upload his broadcasts to Persian's servers via the internet. DSF 14, 15, 17, 18; CAR 812-13 (ECF No. 22-9 at 17-18). Varess worked abroad during both LCA periods, including after he left the United States in November 2013, until Shadjareh told him in July 2014 that he would no longer be paying him. DSF 28. As such, the ARB correctly concluded that "[Persian] has not proven that [Varess] put himself in nonproductive status simply because he was out of the country." CAR 813 (ECF No. 22-9 at 18).[7]

27

28

---

[7] Varess's failure to renew his visa likewise did not place him within this
*(footnote cont'd on next page)*

1

           *d.*    *Persian Never Effected a* Bona Fide *Termination.*

2        An employer is also relieved of the LCA wage requirement "if there has been a

3 *bona fide* termination of the employment relationship."  20 C.F.R. § 655.731(c)(7)(ii).

4 The regulation explains that "DHS regulations require the employer to notify the DHS

5 that the employment relationship has been terminated so that the petition is canceled (8

6 CFR 214.2(h)(11)), and require the employer to provide the employee with payment for

7 transportation home under certain circumstances (8 CFR 214.2(h)(4)(iii)(E))."  *Id.*  The

8 ARB has ruled that this provision requires three elements for a *bona fide* termination: the

9 employer must give notice of termination to the worker, it must notify USCIS, and under

10 certain circumstances, it must provide the worker with payment for transportation home.

11 *ME Global*, 2019 WL 3293915, at *12; *see also Administrator v. S V Techs., LLC*, No.

12 12-042, 2013 WL 6979699, at *3 n.4 (ARB Dec. 23, 2013) (applying these requirements

13 to employers of E-3 workers).  An employer bears the burden of demonstrating that a

14 *bona fide* termination has occurred.  *S V Techs.*, 2013 WL 6979699, at *3 n.4.

15        Persian does not appear to argue that it met all, or any, of these requirements, nor

16 can it, having conceded this factual issue below.  *See* CAR 792 (ECF No. 22-8 at 97)

17 (Persian arguing in its ARB response brief that "[i]t is irrelevant that Respondent never

18 affected *[sic]* a bona fide termination"); CAR 812 (ECF No. 22-9 at 17) (ARB noting

19 that Persian conceded this issue; CAR 975 (ECF No. 22-10 at 80) (same).  Rather, it

20 argues that it was not required to do so because the expiration of Varess's visa on

21 September 12, 2013 eliminated any need to notify USCIS, since the purpose of such

22 notification is to enable the authorities to cancel the worker's visa.  ECF No. 29 at 18.

23        As an initial matter, given that on September 3, 2013, CBP had expressly

24 authorized Varess to remain in the United States until September 2015, DSF 22,

25 Persian's argument that notification to USCIS would have served no purpose does not

26

27 regulatory exception from wage payment.  Even assuming that a failure to renew a visa

28 is "unrelated to employment," 20 C.F.R. § 655.731(c)(7)(ii), it did not render Varess

"unable to work" since he continued to work for Persian after September 2013.

1  withstand scrutiny.  But even assuming that Persian was not required to notify USCIS, it

2  failed to meet the first requirement of the *bona fide* termination—notification to Varess

3  that his employment was terminated.  Persian has presented no authority that would

4  excuse a failure to comply with the most fundamental element of a *bona fide*

5  termination, an "actual meeting of the minds between the employer and the

6  nonimmigrant that the employment relationship is terminated."  *Gupta v. Jain Software*

7  *Consulting, Inc.*, No. 05-008, 2007 WL 1031365, at *4 n.3 (ARB Mar. 30, 2007).  As

8  such, the case Persian cites for its assertion, ECF No. 29 at 17, that circumstance-specific

9  exceptions to the *bona fide* termination requirement are warranted is easily

10  distinguishable because, among other things, the employer in that case gave the

11  employee "clear notice" of termination.  *Compare Batyrbekov v. Barclays Capital*, No.

12  13-013, 2014 WL 3886828, at *8 (ARB July 16, 2014) (wage obligations for H-1B

13  employee ended, despite failure to notify USCIS and pay for return transportation, where

14  employer notified employee of his termination and USCIS approved a petition to change

15  the employee to a new employer).  Additionally, Shadjareh's text message to Varess on

16  July 11, 2014 informing him that it could not afford to pay him did not constitute a *bona*

17  *fide* termination.  For obvious reasons, an employer's abject failure to abide by its wage

18  obligations does not relieve it of compliance with those obligations, and Varess did not

19  understand Shadjareh's message as a notice of termination.  DSF 34.  Finally, while

20  Varess stopped working for Persian in July 2014 in response to this message, there is no

21  evidence that he or Persian ever formally terminated their employment relationship.

22          *e.*      *The ARB's conclusion is consistent with the policy of the E-3*

23                   *statute and regulations.*

24          The ARB's conclusion that Persian remained bound by its wage obligation even

25  after Varess's visa expired and he left the country is consistent with the purpose of the

26  LCA wage requirements.  By entitling nonimmigrant workers to a required wage, these

27  provisions protect American workers by preventing employers from relying on foreign

28  workers who otherwise might accept lower pay.  *See Kolbusz-Kijne v. Tech. Career*

16

*Inst.*, No. 93-LCA-0004, 1994 WL 897284, at \*7 (DOL Ofc. of Admin. Appeals July 18, 1994) (LCA requirements "protect the wages and working conditions of [nonimmigrant] workers, and thereby, also protect the wages and working conditions of U.S. workers similarly employed").  These strict requirements, including payment for nonproductive time, seek to ensure that employers do not exploit foreign workers and, as a result, do not rely on them as a source of cheaper labor.  Even more so than in a regular employment relationship, there is a significant power imbalance between employers and nonimmigrant workers, many of whom—like Varess—have sacrificed greatly for the opportunity to work in the United States and are not in a position to simply quit their jobs and easily return to the *status quo ante*.  Persian took advantage of this situation and of Varess's dedication to his job, continuing to string him along with sporadic payments and hollow promises.  While Varess's situation may have been unusual in that his visa expired and he left the United States while continuing to work under his LCA, Persian's treatment of Varess was precisely the type that the LCA requirements were enacted to prevent: it hired a foreign worker, used his vulnerabilities to extract unpaid and underpaid work, and finally refused to pay him at all.

Contrary to Persian's suggestion, the ARB did not conclude, and DOL does not contend, that an LCA alone can bind an employer even if the worker never enters the United States.  *See* ECF No. 29 at 32.  The wage requirement only applies after the nonimmigrant "enters into employment."  20 C.F.R. § 655.731(c)(6).  And the ARB concluded that a nonimmigrant must enter the United States to satisfy this condition.  *See* CAR 812 (ECF No. 22-9 at 17) (explaining that Varess "entered into employment" when he entered the United States in November 2011 and September 2013 and began working for Persian under the first and second LCAs, respectively).  But as the ARB correctly

held, once that threshold is crossed, the employer must comply with an LCA's wage requirements unless one of the enumerated exceptions is met.[8]

Moreover, as the discussion above demonstrates, the existing regulatory framework is more than adequate to handle scenarios where it would be inappropriate to hold an employer to its LCA attestations. Where a nonimmigrant worker leaves the United States voluntarily and is unable to perform their job as a result, the employer need not pay the required wage. *See* 20 C.F.R. § 655.731(c)(7)(ii). The employer may also relieve itself of its wage liability unilaterally by effecting a *bona fide* termination. *See id.* Here, Persian's responsibility for the required wage for the entire second LCA period is not due to any interpretative error by the ARB, but rather to Persian's choice to ignore the *bona fide* termination requirement, just as it ignored its obligation to pay Varess the required wage in the first place.

Finally, while the government maintains that the ARB's reading was required by the statutory and regulatory text, to the extent that the Court concludes otherwise, the ARB's conclusion that Persian was not relieved of its payment obligations due to Varess's failure to renew his visa and departure from the United States was a reasonable interpretation of statutory and regulatory ambiguities to which this Court must defer.

---

[8] Relatedly, Persian argues that its payment obligations never arose under the second LCA because Varess never "entered into employment" with Persian due to his failure to renew his visa. ECF No. 29 at 24. But that is incorrect both factually and legally. Factually, it is undisputed that, as of September 2013, Varess had an established employment relationship with Persian. DSF 4, 8-19; Plaintiff's Statement of Uncontroverted Facts 4-12. And as a legal matter, an employee "'enter[s] into employment' when he/she first makes him/herself available for work or otherwise comes under control of the employer . . . ." 20 C.F.R. § 655.731(c)(6)(i). That occurred in 2011, and even assuming that the second LCA required a second "ent[ry] into employment," that occurred on September 12, 2013 when the second LCA period began and Varess was already working for Persian in the United States. Persian focuses on language contained in section 655.731(c)(6)(ii), ECF No. 29 at 24, but that subsection—which provides the circumstances under which an employer must start paying an employee who has not yet "entered into employment"—is facially inapplicable.

1  *See Alaska Dep't of Health & Social Servs.*, 424 F.3d at 939; *Landis*, 11 F.4th at 1105.

2  Neither the statute nor the regulations speak directly to this question, and for the reasons

3  set out above, the ARB's resolution of these ambiguities by concluding that an employer

4  remains bound by its wage obligations to an existing E-3 worker who can perform his

5  duties abroad notwithstanding the worker's visa's expiration and overseas travel is a

6  reasonable interpretation that is entitled to deference.

7  　　　　　　　3.　　Varess's Administrative Complaint Was Timely.

8  　　　　An aggrieved party alleging a violation of an LCA must file an administrative

9  complaint "not later than 12 months after the latest date on which the alleged violation(s)

10  were committed," which is "the date on which the employer allegedly failed to perform

11  an action or fulfill a condition specified in the LCA[.]"  20 C.F.R. § 655.806(a)(5).  This

12  time bar, however, "does not affect the scope of the remedies which may be assessed by

13  the Administrator.  Where, for example, a complaint is timely filed, back wages may be

14  assessed for a period prior to one year before the filing of a complaint."  *Id.*

15  　　　　"[T]he limitations begins to run when the violation occurred," which in the case of

16  a wage violation is when an employer fails to pay the required wage when due.  *Jain v.*

17  *Empower IT, Inc. d/b/a Infobahn Techs.*, No. 08-077, 2009 WL 3614509, at *6 (ARB

18  Oct. 30, 2009).  An employer's consistent and continual failure to pay the required wage,

19  including failing to pay for nonproductive time, is a continuing violation.  *ME Global,*

20  2019 WL 3293915, at *7.  Accordingly, where, as here, an employer continues to fail to

21  pay an employee the required wage and does not effect a *bona fide* termination, the

22  violation is "actionable for the duration of the employment relationship as stipulated in

23  the LCA," since the violation continues as long as the employer is required to pay the

24  employee and fails to do so.  *Id.*

25  　　　　As set out above, both of Persian's LCAs required it to pay Varess the required

26  wage.  Persian's failure to do so was consistent and continuing, and persisted for the

27  duration of the employment relationship, which, because Persian never effected a *bona*

28  *fide* termination, persisted until the end of the second LCA period on September 12,

19

1    2015.  As such, the limitations period had not even begun to run when Complainant filed
2    his written complaint in February 2015, and Varess's timely complaint on that date
3    permitted him to seek back wages for the entire duration of his employment.

4        Persian's argument that Varess's complaint was untimely is premised on the
5    assumption that its wage obligations to Varess—and any violations—terminated either in
6    September 2013, when his visa expired, or in November 2013, when he left the United
7    States, and therefore that his complaint in February 2015 was more than 12 months after
8    Persian's latest violation.  However, as explained at length above, Persian's wage
9    obligations did not terminate because Varess's non-renewal of his visa and departure
10   from the United States did not affect the binding nature of the LCAs or render him
11   unable to work, and because Persian failed to effect a *bona fide* termination.

12       Varess's complaint was also timely under an alternative conclusion in which the
13   events of July 11-14, 2014—Persian's nonpayment of wages and Varess's decision to
14   stop working for Persian—were sufficient to constitute a termination of the employment
15   relationship.  Under such a scenario, Persian's last violation occurred in July 2014,
16   which was well within 12 months preceding Varess's administrative complaint.  Such a
17   result would entitle Varess to any back wages due from September 2011 through July
18   2014, which would include the entire first LCA period and a portion of the second.

19   **B.    The Court Should Grant Summary Judgment to Defendants on Their**
20   **Counterclaim for Enforcement of the ARB's Order.**

21       If the Court agrees that the ARB's order should be upheld, it should also grant
22   summary judgment to Defendants on Count One of their counterclaim for enforcement
23   of the order, and should enter a judgment directing that Persian pay Varess (or DOL for
24   Varess's benefit) $183,794, plus prejudgment and postjudgment interest.[9]

25
26
27
28   [9] Defendants' counterclaim also included a second count under the Federal Debt
     Collection Procedures Act.  Defendants are no longer pursuing that count.

20

1.  Defendants Are Entitled to a Judgment Enforcing the ARB's Order.

When a federal agency such as DOL issues an administrative order pursuant to its delegated statutory authority, the agency or the United States may obtain a judgment to enforce that order.  *See*, *e.g.*, *United States v. Occidental Chem. Corp.*, 200 F.3d 143, 149 n.6 (3d Cir. 1999) (suit to enforce Environmental Protection Agency's order under the Comprehensive Environmental Response, Compensation, and Liability Act); *United States v. Santee Sioux Tribe of Neb.*, 135 F.3d 558, 562 (8th Cir. 1998) (suit to enforce order of the National Indian Gaming Commission under the Indian Gaming Regulatory Act) (citing 28 U.S.C. § 516); *Irwin Co., Inc. v. 3525 Sage St. Assocs., Ltd.*, 37 F.3d 212, 215-16 (5th Cir. 1994) (characterizing DOL's right to enforce its back-wage order under a Davis-Bacon Related Act, including to "counterclaim[] for enforcement of [its] order," as "a necessary incident of the Secretary's authority"); *United States v. Town of Bolton Landing*, 946 F. Supp. 162, 171 (N.D.N.Y. 1996) (granting partial summary judgment to the United States in action to enforce a DOL back-wage order under a Davis-Bacon Related Act).  Here, as explained above, in order to protect nonimmigrant workers like Varess and their American counterparts, Congress authorized DOL to enforce the INA's wage obligations by issuing final orders requiring the payment of back wages.  *See* 8 U.S.C. § 1182(t)(3)(D); *Cyberworld Enter. Techs., Inc. v. Napolitano*, 602 F.3d 189, 198 (3d Cir. 2010) (DOL's enforcement of LCAs "vindicate[s]" rights that "are of a 'public' nature, since [DOL] is acting to protect the U.S. workforce from displacement by [nonimmigrant visa] recipients and to enforce the rules of the immigration system").  A judgment in this enforcement action will fully effectuate DOL's authority by ensuring that the back wages DOL found due are paid.  *See United States v. City of Redwood City*, 640 F.2d 963, 969 (9th Cir. 1981) ("It has been established as a general rule that the United States may sue to protect its interests.").

Defendants are therefore entitled to a judgment on their counterclaim to enforce the ARB's order and the INA.  The facts underlying the counterclaim are straightforward and undisputed.  The Secretary, acting through the ARB, has ordered Persian to pay back

wages and interest to Varess pursuant to 8 U.S.C. § 1182(t)(3)(D). Persian has not complied with the Secretary's order. DSF 45; ECF No. 12 at 4 ¶ 28 (Plaintiff's Answer to Defendants' Counterclaim, admitting allegation in ECF No. 11 at 14 ¶ 28). Therefore, if the Court agrees that the ARB's order was consistent with the APA, it should grant summary judgment to Defendants on their counterclaim and enter a judgment directing Persian to pay the back wages and interest due under the order. *Accord S. Ill. Univ. School of Med. v. U.S. Dep't of Labor*, No. 1:18-cv-1092, 2021 WL 5609845, at *7 (C.D. Ill. Nov. 30, 2021) (granting summary judgment to DOL in an APA challenge to an ARB back-wage order in an H-1B case and ordering the employer to pay the worker the back wages due).

### 2. The Court Should Award Prejudgment Interest at the Rate Set by the ARB, and Postjudgment Interest Pursuant to 28 U.S.C. § 1961.

As the ARB has concluded, while the INA does not explicitly mention awards of interest, prejudgment and postjudgment interest are appropriate on INA back-wage awards. *See Mao v. Nasser Eng'g & Comput. Servs.*, No. 06-121, 2008 WL 5079135, at *6 (ARB Nov. 26, 2008). The ARB accordingly affirmed the ALJ's interest award in this case. CAR 824 (ECF No. 22-9 at 29), 976 (ECF No. 22-10, at 81). Under ARB precedent, both prejudgment and postjudgment interest are awarded using the rate charged on the underpayment of federal income taxes. *See Mao*, 2008 WL 5079135, at *6; 26 U.S.C. § 6621(a)(2). This rate is currently 3 percent.[10] The Ninth Circuit, however, has held that in general, prejudgment interest should be awarded at the rate prescribed by 28 U.S.C. § 1961(a) for postjudgment interest, "unless the trial judge finds, on substantial evidence, that the equities of the particular case require a different rate." *W. Pac. Fisheries, Inc. v. SS President Grant*, 730 F.2d 1280, 1289 (9th Cir. 1984). 28 U.S.C. § 1961(a) provides for "a rate equal to the weekly average 1-year

---

[10] *See* https://www.irs.gov/newsroom/interest-rates-remain-the-same-for-the-fourth-quarter-2021.

constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System," which is currently 0.28%.[11]

Since a judgment in this case would simply enforce the ARB's order, and since Persian has not challenged the ARB's interest award, a prejudgment interest award at the ARB's higher rate is appropriate here, particularly given that this case involves wages owed for as much as a decade. Any interest after the date of the entry of judgment in this Court should be awarded at the rate prescribed by 28 U.S.C. § 1961(a).

## V.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their cross-motion and deny Plaintiff's motion for summary judgment.

_____

---

[11] *See* https://www.federalreserve.gov/releases/h15/ (Release Date Dec. 10, 2021).

1

Dated: December 13, 2021

Respectfully submitted,
TRACY L. WILKISON
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, General Civil Section

*/s/* Matthew J. Smock
MATTHEW J. SMOCK
Assistant United States Attorney

Attorneys for Defendants

Of counsel:
Jennifer S. Brand, Associate Solicitor
Jonathan Kronheim, Counsel for Trial
Litigation
Jesse Z. Grauman, Senior Attorney
U.S. Department of Labor
Office of the Solicitor
Fair Labor Standards Division
200 Constitution Avenue NW
Room N-2716
Washington, D.C. 20210

Attorneys for Defendants

24